COMMONWEALTH OF VIRGINIA:

LOUDOUN COUNTY CIRCUIT COURT

| | | |
|---|---|---|
| JOHN F. SAYRES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CL-56160 |
| | ) | |
| THE WHEATLAND GROUP, LLC, and | ) | |
| | ) | |
| JOSEPH EVANGELISTO, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff John F. Sayres, by counsel, respectfully submits this First Amended

Complaint (the "Complaint") for declaratory judgment, cancellation and rescission, unjust

enrichment and money had and received, fraud, conversion, libel and slander, and, in the

alternative, breach of contract, against Defendants The Wheatland Group, LLC and Joseph

Evangelisto.

## PARTIES

1.      Plaintiff John F. Sayres ("Mr. Sayres" or "Plaintiff") is an individual resident

of the State of Maryland.

2.      The Wheatland Group, LLC ("Wheatland") is a Virginia limited liability

company with its principal office and principal place of business at 500 East Main Street,

Purcellville, Virginia 20132, which is in Loudoun County.

3.      Joseph Evangelisto is an individual resident of Loudoun County, Virginia.

He is, and at all relevant times has been, the managing member and sole member of

Wheatland.  He is regularly employed at Wheatland's principal office and principal place

Notice of Removal
April 14, 2010
EXHIBIT A

of business at 500 East Main Street, Purcellville, Virginia 20132, which is in Loudoun County. He resides at 38168 Millstone Drive, Purcellville, Virginia 20132.

## JURISDICTION AND VENUE

4.     Jurisdiction and venue are proper in this Court because both Defendants are residents of Loudoun County and because the house and property that are the subject of Plaintiff's Complaint both are located in Loudoun County. In addition, the conduct of which Plaintiff complains occurred in substantial part in Loudoun County.

5.     Plaintiff's damages claim, and thus the amount in controversy at issue in this civil action pursuant to Plaintiff's Complaint, exceeds $100,000, exclusive of interest, costs and attorneys' fees.

## FACTS

### A.     The Purported Contract Is Illusory and Invalid

6.     On or about March 31, 2007, Plaintiff as the putative purchaser and Wheatland as the putative builder and seller signed a purported written contract for the construction and sale of a house (the "House") and for the conveyance of a piece of property located at 14416 Loyalty Road, Leesburg, VA 20176 (the "Subject Property").

7.     The original purported "Fixed Price Contract" for sale of the Subject Property (the "Purported Contract"), along with its first amendment extending the time for Plaintiff to make his down payment (the "First Amendment"), are attached hereto as Exhibits A and B.

8.     Mr. Sayres paid a down payment of $250,000 on or about April 22, 2007.

9.     Mr. Sayres also paid an additional $154,000 in erroneously imposed upgrade fees, overages and design fees in large part because Wheatland reneged upon and

2

repudiated the furnishings and options materials allowance budget set forth in the "Sayres Allowance Schedule" and Paragraph 5(A) of the Purported Contract. Wheatland falsely claimed that the materials cost allowance schedule and budget also restricted the labor, design and installation costs that Mr. Sayres was entitled to have spent, included in the contract price, for items such as cabinetry, countertops, flooring, windows, doors and exterior finishes. In fact, according to the express provisions of the Purported Contract, the Sayres Allowance Schedule limited the included cost of only the "materials" portion of the specified options, features and allowances.

10.     Paragraph 13 of the Purported Contract provides in its entirety as follows:

> Default.  If Buyer fails to comply with this contract, Buyer will be in default, and Seller may either:  (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and retain the entire deposit specified in Paragraph 3A as liquidated damages, thereby releasing both parties from this contract.  If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, the Closing Date will be extended as necessary.  **If Seller fails to comply with this Contract for any other reason, Seller will be in default and Buyer may, as Buyer's sole and exclusive remedy, terminate this contract and receive from Seller the deposit less any changes to plans, specifications, decorative finish schedule or change orders, as agreed liquidated damages, thereby releasing both parties from the contract.**

(emphasis supplied).

11.     Prior to April of 2009, Mr. Sayres had paid and forwarded to Wheatland $103,804.63 for the costs of actual or alleged changes, upgrades or overages relating to the House and the Subject Property.  Therefore, Mr. Sayres is at least entitled to a full refund of his $250,000 deposit plus the $103,804.63 he paid for asserted upgrade and overage fees.

12.     Paragraph 13 of the Purported Contract by its express terms purported to permit Wheatland to breach, terminate or cancel the Purported Contract at will, keeping the House

3

and Subject Property for itself, or selling it to a third party, with Mr. Sayres having no remedy other than (at best) obtaining a refund without interest of the funds he had paid toward the purchase of the House and Subject Property.

13.     Paragraph 13 of the Purported Contract renders it and all subsidiary and related change orders and contracts void, voidable and invalid for lack of consideration, lack of mutuality of obligation, and lack of mutuality of remedy.

14.     Mr. Sayres validly and effectively cancelled, terminated and rescinded the Purported Contract as of April 22, 2009 through the letter attached as Exhibit C.

## B.     The Purported Contract Was Effectively Terminated, Rescinded and Cancelled By Letter Dated April 22, 2009.

15.     In the alternative, to the extent the Purported Contract was a valid and binding agreement, Mr. Sayres effectively terminated, cancelled and rescinded it by letter from counsel dated April 22, 2009, a copy of which is attached hereto as Exhibit C. This was a week before Wheatland obtained an occupancy permit on the House or the Subject Property.

16.     A reasonable time for construction of the House on the Subject Property would have been 18 months from the Purported Contract date of March 31, 2007. Wheatland repeatedly promised and represented to Mr. Sayres, on the day the Purported Contract was signed, and on other occasions, that the House would be completed by November 2008. Wheatland repeatedly informed Mr. Sayres, on the day the Purported Contract was signed, and on other occasions, that the House could be completed by the summer of 2008 if all the option and allowance selections were made promptly.

17.     Wheatland repeatedly promised to finish construction of the House on the Subject Property and to have it ready for occupancy or sale by April 15, 2009. Wheatland first promised and agreed to this completion date on or about December 11, 2008, and Wheatland

4

reiterated its agreement to the April 15, 2009 delivery date in February 2009 and on or about March 3, 2009. In fact, on or about March 20, 2009 Wheatland sent Mr. Sayres a letter demanding closing on April 15, 2009 and asserting that "time is of the essence as to all of the times and dates herein."

18.     On or about August 21, 2008, the parties signed a change order (the "August 2008 Change Order") a true copy of which is attached as Exhibit D. The August 2008 Change Order provided in relevant part that "all materials already ordered to date (8/13/08) will remain included in completion of the construction ...." (Ex. D).

19.     The only options or designs not previously selected by Mr. Sayres at the time the August 2008 Change Order was signed were garage doors, carpeting and paint colors.

**1.      Wheatland's Failure To Honor The Sayres Allowance Schedule**

20.     Attached to the Purported Contract, which was drafted and prepared by Wheatland, was the "Sayres Allowance Schedule." Paragraph 5(A) of the Purported Contract described the "Sayres Allowance Schedule" as "allowances for **materials** to be selected at Buyer's discretion" (emphasis supplied), for items such as cabinetry, countertops, flooring, windows, doors and exterior finishes.

21.     However, Wheatland unilaterally repudiated, breached and reneged upon the Purported Contract, to the extent it was a valid contract, by taking the position that the budget and pricing set forth in Sayres Allowance Schedule limited the cost not only of the materials, but also limited the cost of the labor, design and installation, of the options, designs and features from which Mr. Sayres needed to select that would be included in the original contract price.

5

22. Thus, instead of giving Mr. Sayres $1,097,500.00 to purchase the materials for the listed options, designs and furnishings, Wheatland made him use that same budget to purchase the entire labor, design, and installation of those furnishings, designs and options.

23. Wheatland incorrectly required Mr. Sayres to make the following erroneous upgrade or overage payments in the following amounts for the following options or features:

| ITEM | AMOUNT | Month/Year Sayres Paid Wheatland |
|------|--------|----------------------------------|
| Windows | $27,860.67 | *10/07* |
| Cabinets | $20,080.39 | *12/07* |
| Appliances | $19,460.34 | *03/08* |
| Plumbing Hardware | $3,655.96 | *03/08* |
| Bathroom hardware | $673.73 | *01/08* |
| Elevator Upgrade | $4,650.00 | *04/08* |
| Tech. System with Wiring upgrades | $24,904.33 | *04/08* |
| Laundry Room Island | $2,519.24 | *03/08* |
| Total | **$ 103,804.63** | |

24. This unilateral change, breach and repudiation by Wheatland of the Sayres Allowance Schedule cost Mr. Sayres approximately $500,000 as compared to the furnishings and options that would have been available to him had Wheatland complied with the provision in the Purported Contract providing that the budget set forth in the allowance schedule only limited Mr. Sayres's material costs. It diminished the value of the House in at least the same

6

amount. As a direct result of Wheatland's breach and repudiation of Paragraph 5(A) and the Sayres Allowance Schedule, Wheatland wrongfully purported to impose an additional $103,804.63 in asserted upgrade fees and allowance cost overruns on Mr. Sayres.

25.     Regarding the features and options set forth in Paragraph 23, only the windows, cabinets and laundry room island had been installed correctly by the time Mr. Sayres terminated the Purported Contract through the letter attached as Exhibit C. The elevator, appliances, and technology package with wiring upgrades had not been installed, and the plumbing and bathroom hardware had been unilaterally modified by Wheatland and installed incorrectly to cut costs, despite the fact that they had all been paid for by Mr. Sayres before the August 2008 Change Order, were or should have been ordered from vendors by then, and had not been installed by then.

26.     In building out but not completing the House on the Subject Property, Wheatland spent far less of its own money on allowance/option materials than the $1,097,500 provided for in the Sayres Allowance Schedule, thus breaching the Purported Contract and shortchanging Mr. Sayres and the House of valuable furnishings, equipment and included options which Mr. Sayres was entitled to have included in the base purchase price.

## 2.     Wheatland's Failure To Complete The House on Time

27.     Despite its repeated promises and agreements to complete the House on the Subject Property by November 2008 and then April 15, 2009, and despite stating in writing that "time is of the essence," Wheatland failed to complete or substantially complete the House by April 15, 2009, nor by April 22, 2009 when the Purported Contract was terminated, and Wheatland had not obtained an occupancy permit by then.

28.     As of April 19, 2009 and April 22, 2009, at least the following material items

were incomplete and unfinished: (A) there was no elevator in the House as required by the specifications, (B) all bedrooms except the master bedroom lacked flooring, (C) the generator was missing from the side of the House, (D) many of the appliances had not been installed, (E) the lighting fixtures still had not been installed and were missing, and (F) the House was missing security and entertainment speakers and related panels.

29.    All of these items were missing, and the House was still incomplete, as of April 19, 2009 and April 22, 2009, despite the fact that on or about March 20, 2009 Wheatland had sent Mr. Sayres a letter demanding closing on April 15, 2009 and asserting that "time is of the essence as to all of the times and dates herein." In part because Wheatland had demanded that time was of the essence, its failure to complete the House on the Subject Property by April 15, 2009 was not only a breach and default, but a material breach and default entitling Mr. Sayres to rescind the Purported Contract and to recover his down payment, all amounts that he paid Wheatland pursuant to the Purported Contract and the change orders, and – if the Purported Contract generally is enforceable but  the limitation of remedy provisions are unconscionable or otherwise invalid -- all consequential damages and expenditures that he made for designers and upgrades relating to the House on the Subject Property, and the $200,000 diminished value of his previously owned  house and land in Maryland resulting from the delay.

**3.    Wheatland's Breach of the August Change Order and Incorrect and Impermissible Materials, Design and Option Changes**

30.    To the extent the Purported Contract is valid and enforceable, Wheatland breached the provision of the August Change Order which stated that "all materials already ordered to date (8/13/08) will remain included in completion of the construction ...." (Ex. D).

31.    Wheatland, without authorization from Mr. Sayres, wrongfully cancelled and did not install the previously ordered flooring tiles and wood flooring, so that it could

8

impermissibly replace them with cheaper and incorrect flooring tiles and wood flooring over the almost 8,000 square feet of still unfinished floor space, despite the fact that the correct flooring tiles and wood flooring already had been ordered by the date of the August 2008 Change Order.

32. Without authorization from Mr. Sayres, Wheatland wrongfully cancelled or changed the orders for appliances, plumbing fixtures and lighting fixtures, so that it could impermissibly replace the ordered and specified items with cheaper alternatives, despite the fact that the correct, specified appliances, plumbing and lighting fixtures already had been ordered (and paid for by Mr. Sayres as to at least his portion) by the date of the August 2008 Change Order. No later than March of 2008, Mr. Sayres had paid and fronted Wheatland $23,590.03 by check for Wheatland's erroneously imposed overage and upgrade charges for the correct, specified appliances and plumbing fixtures selected by Mr. Sayres.

33. Wheatland incorrectly required Mr. Sayres to make the following erroneous upgrade or overage payments in the following amounts for the following options or features:

| ITEM | AMOUNT | Month/Year Sayres Paid Wheatland |
|------|--------|--------------------------------|
| Windows | $27,860.67 | *10/07* |
| Cabinets | $20,080.39 | *12/07* |
| Appliances | $19,460.34 | *03/08* |
| Plumbing Hardware | $3,655.96 | *03/08* |
| Bathroom hardware | $673.73 | *01/08* |
| Elevator Upgrade | $4,650.00 | *04/08* |

| | | |
|---|---|---|
| Technology Package with Wiring upg | $24,904.33 | *04/08* |
| Laundry Room Island | $2,519.24 | *03/08* |
| Total | **$103,804.63** | |

34. Regarding the features and options set forth in Paragraph 33, only the windows, cabinets, and laundry-room island had been installed correctly by the time Mr. Sayres terminated the Purported Contract by letter dated April 22, 2009. The elevator, appliances, and technology package with wiring upgrades had not been installed, and the plumbing and bathroom hardware had been unilaterally modified by Wheatland and installed incorrectly to cut costs, despite the fact that all of these upgrade costs had been paid for by Mr. Sayres as to his portion at least several months before the August 2008 Change Order, the materials and equipment were or should have been ordered from suppliers and vendors by then, and the materials and equipment had not been installed by then.

35. By canceling orders for and failing to install the specified items (including lighting fixtures) and specified purported upgrades, Wheatland materially violated the terms of the August 2008 Change Order and the Purported Contract, diminishing the value of the House substantially and damaging Mr. Sayres if he were ordered to purchase it.

36. Wheatland breached and defaulted on the Purported Contract and the August 2008 Change Order by repeatedly stating that it needed money up front to pay vendors or to cover the costs of purported overages and incorrectly asserted upgrades that should have been included in the allowance budget originally, and then not actually paying the vendors at all nor with the money provided by Mr. Sayres.

37. For example, in or around April 2008 Wheatland collected $24,904.33 from

10

Mr. Sayres for an audio, video and security technology package which Wheatland falsely claimed was an upgrade. Mr. Sayres paid Wheatland $24,904.33 which Wheatland promised and represented that it was going to use to pay AEGIS Technologies, the vendor of the technology package, for that package. However, Wheatland failed to pay AEGIS Technologies, failed to purchase the technology package, and failed to install the technology package at any time before the Purported Contract was terminated.

38.    As another example, on March 8, 2008, Mr. Sayres paid Wheatland $4,650.00 for a purported elevator upgrade that Wheatland incorrectly contended was in excess of the $25,000 elevator budget set forth in the Sayres Allowance Schedule. Wheatland promised and represented that it was going to use Mr. Sayres' payment of $4,650.00 to pay Innovative Lifts, the elevator vendor, for the cost of the purported elevator upgrade. However, Wheatland never in fact paid Innovative Lifts nor otherwise purchased nor installed an elevator in the House at any time before the Purported Contract was terminated by letter dated April 22, 2009.

## COUNT I:  DECLARATORY JUDGMENT THAT THE PURPORTED CONTRACT IS VOID, INVALID AND UNENFORCEABLE

39.    Mr. Sayres incorporates by reference the averments and allegations stated in Paragraphs 1 through 14 to this Complaint as though expressly set forth herein.

40.    Paragraph 13 of the Purported Contract by its express terms purported to permit Wheatland to breach, terminate or cancel the Purported Contract at will, keeping the House and Subject Property for itself, or selling it to a third party, with Mr. Sayres having no remedy other than (at best) obtaining a refund without interest of the funds he had paid toward the purchase of the House and Subject Property.

WHEREFORE, Paragraph 13 of the Purported Contract renders it and all subsidiary and related change orders and contracts void, voidable and invalid for lack of consideration,

11

lack of mutuality of obligation, and lack of mutuality of remedy, and Mr. Sayres seeks a declaratory judgment to that effect.

WHEREFORE, the Purported Contract was validly terminated, cancelled and rescinded by the letter dated April 22, 2009 (Ex. C), as of that date, and Mr. Sayres seeks a declaratory judgment to that effect.

## COUNT II: CANCELLATION AND RESCISSION

41.     Mr. Sayres incorporates by reference the averments and allegations stated in Paragraphs 1 through 14 to this Complaint as though expressly set forth herein.

42.     Paragraph 13 of the Purported Contract by its express terms purported to permit Wheatland to breach, terminate or cancel the Purported Contract at will, keeping the House and Subject Property for itself, or selling it to a third party, with Mr. Sayres having no remedy other than (at best) obtaining a refund without interest of the funds he had paid toward the purchase of the House and Subject Property.

43.     Paragraph 13 of the Purported Contract renders it and all subsidiary and related change orders and contracts void, voidable and invalid for lack of consideration, lack of mutuality of obligation, and lack of mutuality of remedy.

44.     Because the Purported Contract is void and invalid for lack of consideration, lack of mutuality of obligation, and lack of mutuality of remedy, Mr. Sayres is entitled to rescind the Purported Contract and to recover from Wheatland the $353,804.63 that Mr. Sayres paid Wheatland relating to the House or pursuant to the Purported Contract.

WHEREFORE, Mr. Sayres requests the Court to order and decree that the Purported Contract is or has been validly and effectively cancelled and rescinded, and to enter judgment against Wheatland and in favor of Mr. Sayres in the amount of $353,804.63, with post-

judgment interest and the statutory rate and with pre-judgment interest at the statutory rate beginning as of April 22, 2009.

### COUNT III:  UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED

45.    Mr. Sayres incorporates by reference the averments and allegations stated in Paragraphs 1 through 14 to this Complaint as though expressly set forth herein.

46.    Mr. Sayres paid Wheatland $353,804.63 directly for the deposit or down payment and for alleged overage and upgrade fees relating to the House, and he paid another $50,000 to an interior designer working on the House which inured to the benefit of the House and to the benefit of Wheatland as its owner in the amount of at least $50,000.

47.    By taking Mr. Sayres' money, not properly or timely completing the House, not using his money to pay subcontractors or vendors who provided equipment, labor and materials for the House (thereby causing mechanics' liens to be filed on the House), and not providing Mr. Sayres with a valid and enforceable contract with adequate remedies for breach or default by Wheatland, and by cheating Mr. Sayres out of erroneous purported upgrade and allowance payments, Wheatland has had and received the payments from Mr. Sayres and the benefits thereof, and Wheatland has been unjustly enriched by them.

48.    It would be unjust, unfair and inequitable to permit Wheatland to retain Mr. Sayres' payments and the benefits thereof without properly or timely completing the House, not using his money to pay subcontractors or vendors who provided equipment, labor and materials for the House (thereby causing mechanics' liens to be filed on the House),  not providing Mr. Sayres with a valid and enforceable contract with adequate remedies for breach or default by Wheatland, and by cheating Mr. Sayres out of erroneous purported upgrade and allowance payments.

13

WHEREFORE, Mr. Sayres seeks entry of judgment against Wheatland in the amount of $403,804.63 for damages or restitution for unjust enrichment and money had and received, with post-judgment interest and the statutory rate and with pre-judgment interest at the statutory rate beginning as of April 22, 2009.

### COUNT IV: CONVERSION (vs. Wheatland and Evangelisto)

49.　Plaintiff incorporates by reference the averments and allegations stated in Paragraphs 1 through 14 to this Complaint as though expressly set forth herein.

50.　In or shortly before March of 2008, Mr. Sayres paid and fronted Wheatland $23,590.03 by check for Wheatland's erroneously imposed overage and upgrade charges for the specified appliances and plumbing and lighting fixtures. Mr. Sayres made these payments because Wheatland through Evangelisto promised and represented, orally and outside of any contract or document, that they were overage or upgrade charges and that the funds advanced would be used to pay the vendors and suppliers for the specified appliances and plumbing fixtures. Wheatland through Evangelisto cancelled or changed the orders for appliances, plumbing fixtures and lighting fixtures, so that they could impermissibly replace the ordered and specified items with cheaper alternatives, or not buy them at all, despite the fact that the correct, specified appliances, plumbing and lighting fixtures already had been ordered (and paid for by Mr. Sayres as to his portion) before the date of the August 2008 Change Order.

51.　In or around April 2008, Wheatland through Evangelisto collected $24,904.33 from Mr. Sayres for an audio, video and security technology package which Wheatland and Evangelisto falsely claimed was an upgrade. Mr. Sayres paid Wheatland $24,904.33 which Wheatland through Evangelisto promised and represented, orally and outside of any contract or document, that they were going to use to pay AEGIS Technologies, the vendor of the

14

technology package, for that package. However, Wheatland acting pursuant to the instructions and directions of Evangelisto deceptively and secretly decided not to pay AEGIS Technologies, not to purchase the technology package, and not to install the technology package. Defendants failed to pay for or install the technology package before the Purported Contract was terminated, even though it had been ordered but not completely installed before the date of the August 2008 Change Order.

52. As another example, on March 8, 2008, Mr. Sayres paid Wheatland through Evangelisto $4,650.00 for a purported elevator upgrade that Wheatland through Evangelisto incorrectly contended was in excess of the $25,000 elevator budget set forth in the Sayres Allowance Schedule. Wheatland through Evangelisto promised and represented, orally and outside of any documents, that they were going to use Mr. Sayres' payment of $4,650.00 to pay Innovative Lifts, the elevator vendor, for the cost of the purported elevator upgrade. However, Wheatland, acting pursuant to the instructions and direction of Evangelisto, deceptively and secretly decided not to pay Innovative Lifts and deceptively and secretly decided not to otherwise purchase or install an elevator in the House. Defendants failed to pay for or install the elevator for the House at any time before the Purported Contract was terminated by letter dated April 22, 2009, even though the elevator had been ordered but not completely installed before the date of the August 2008 Change Order.

53. By taking Mr. Sayres' funds under false pretenses and not using them to pay vendors or to obtain and install the relevant options, equipment and alleged upgrades, Wheatland and Evangelisto improperly and tortiously converted Mr. Sayres' money, exercising improper dominion and control over it in a manner which damaged and injured Mr. Sayres and diminished the value of the House.

54. Wheatland through Evangelisto took $54,000 from Mr. Sayres for purported upgrades that were not paid for or installed or which were not installed with the grade and quality of materials specified at any time before the Purported Contract was terminated. Defendants failed to pay for or install these putative upgrades even though they had been ordered but not completely installed before the date of the August 2008 Change Order.

55. Wheatland and Evangelisto took Mr. Sayres' payments for purported upgrades and spent them on labor and materials for other houses they were building for other customers, on general business and personal expenses, and on a vacation for Mr. Evangelisto.

56. Defendants' conversion and diversion to other uses of Mr. Sayres' payments for asserted upgrades, and their failure to use those funds to pay vendors of labor, equipment and materials for the House being built by Mr. Sayres, as promised and represented, delayed the completion of the House by over six months from November 2008 through at least the time the Purported Contract was terminated by letter dated April 22, 2009.

57. As the result of Defendants' willful and tortious conversion of funds paid by Mr. Sayres for erroneously assessed upgrade fees, Mr. Sayres has lost the $54,000 in converted alleged upgrade fees and has lost $200,000 in the diminished value of his previously owned house and land in Maryland due to the construction and completion delays caused by Defendants not using funds paid by Mr. Sayres to pay the suppliers of equipment, labor and materials for the House being built for Mr. Sayres, as promised and represented.

58. Defendants' tortious conversion of Mr. Sayres' payments for erroneously assessed upgrade fees was willful and intentional and was done with the intent to injure Mr. Sayres and with a reckless disregard for the rights of Mr. Sayres. Therefore, Mr. Sayres is entitled to recover $360,000 in punitive or exemplary damages from the Defendants, jointly

16

and severally.

WHEREFORE, Mr. Sayres is entitled to recover as damages for tortious conversion $256,000 in actual compensatory damages and $360,000 in punitive damages from each Defendant, jointly and severally, plus pre-judgment and post-judgment interest at the statutory rates from April 22, 2009, plus litigation costs and expenses.

## COUNT V: FRAUD (v. Wheatland and Evangelisto)

59.     Plaintiff incorporates by reference the averments and allegations stated in Paragraphs 1 through 14 to this Complaint as though expressly set forth herein.

60.     On or about March 31, 2007, Wheatland through Evangelisto promised and represented to Mr. Sayres, falsely and without the intent to honor or perform their promises and representations, that they would treat the Sayres Allowance Schedule as limiting only the materials costs for the specified furnishings, equipment and decorative items, instead of limiting service and installation costs as well.

61.     Wheatland and Evangelisto made this promise and representation knowing that they did not intend to perform it and with the intent that Mr. Sayres would rely upon it in signing the Purported Contract and paying his $250,000 downpayment and deposit.

62.     In actual and reasonable reliance on Defendants' false promises and misrepresentations that they would treat the Sayres Allowance Schedule as limiting only the materials costs, Mr. Sayres signed the Purported Contract and paid his $250,000 downpayment or deposit.

63.     In May 2008, Wheatland through Evangelisto falsely and incorrectly asserted and represented that the budget set forth in the Sayres Allowance Schedule and Paragraph 5(A) of the Purported Contract which they had drafted limited materials, labor, installation and

17

design costs for the specified furnishings, equipment and decorative items, instead of limiting only materials costs.

64.    Wheatland and Evangelisto made this assertion and representation knowing that it was false and with the intent that Mr. Sayres would rely upon it in authorizing change orders and paying upgrade and overage fees.

65.    On information and belief, before they ran into financial difficulties, Wheatland and Evangelisto had interpreted similar provisions in their other building contracts as limiting only materials costs for the specified furnishings, equipment and decorative items.

66.    In actual and reasonable reliance on Defendants' misrepresentations relating to the Purported Contract and the Sayres Allowance Schedule, Mr. Sayres paid Defendants $104,000 in erroneously asserted upgrade and overage charges.

67.    In or shortly prior to March 2008, Mr. Sayres paid and fronted Wheatland $23,590.03 by check for Wheatland's erroneously imposed overage and upgrade charges for the specified appliances, plumbing fixtures and lighting fixtures. Mr. Sayres made these payments because Wheatland through Evangelisto (orally and outside of any contract or document) represented, in or shortly prior to March 2008, that they were overage or upgrade charges and that the funds advanced would be used to pay the vendors and suppliers for the specified appliances, plumbing fixtures and lighting fixtures. Wheatland through Evangelisto cancelled or changed the orders for appliances, plumbing fixtures and lighting fixtures, so that they could impermissibly replace the ordered and specified items with cheaper alternatives, or not buy them at all, despite the fact that the correct, specified appliances, plumbing and lighting fixtures already had been ordered (and paid for by Mr. Sayres at least as to his portion) before the date of the August 2008 Change Order.

18

68.    In or about April 2008, Wheatland through Evangelisto collected $24,904.33 from Mr. Sayres for an audio and security technology package which Wheatland and Evangelisto falsely claimed was an upgrade. Mr. Sayres paid Wheatland $24,904.33 which Wheatland through Evangelisto, in or about April 2008 (orally and outside of any contract or document) promised and represented that they were going to use to pay AEGIS Technologies, the vendor of the technology package, for that package. However, Wheatland acting pursuant to the instructions and directions of Evangelisto deceptively and covertly decided not to pay AEGIS Technologies, not to purchase the technology package, and not to install the technology package.

69.    As another example, on March 8, 2008, Mr. Sayres paid Wheatland through Evangelisto $4,650.00 for a purported elevator upgrade that Wheatland through Evangelisto incorrectly contended was in excess of the $25,000 elevator budget set forth in the Sayres Allowance Schedule. On or about March 8, 2008, Wheatland through Evangelisto (orally and outside of any contract or document) promised and represented that they were going to use Mr. Sayres' payment of $4,650.00 to pay Innovative Lifts, the elevator vendor, for the cost of the purported elevator upgrade. However, Wheatland acting pursuant to the instructions and direction of Evangelisto deceptively and covertly decided not to pay Innovative Lifts and deceptively and covertly decided not to otherwise purchase or install an elevator in the House.

70.    Each time Wheatland through Evangelisto contacted Mr. Sayres for payments for incorrectly asserted option upgrades and overages, they knowingly misrepresented (orally and outside of any contract or document) that the funds being sought were in fact for an upgrade or overage, they knowingly misrepresented that they intended and needed to use the payments collected to fund and pay the vendors of the relevant option, equipment or

furnishing, and they lacked the present intention to use the funds paid by Mr. Sayres to pay the vendors or suppliers of the alleged upgrades or options. Rather, Mr. Evangelisto and Wheatland planned and intended to use those funds to build other customers' houses and to pay for their own general business and personal expenses.

71.     Each time Wheatland through Evangelisto contacted Mr. Sayres for payments for incorrectly asserted option upgrades and overages, they intended that Mr. Sayres would rely upon their misrepresentations in paying the erroneously assessed upgrade and overage charges.

72.     Mr. Sayres reasonably and actually relied upon the misrepresentations of Wheatland through Evangelisto in paying $104,000 in erroneously assessed upgrade or overage fees, $54,000 of which were not used to fund the specified options or upgrades, thus damaging Mr. Sayres in the amount of $104,000.

73.     Wheatland and Mr. Evangelisto were running out of money and capital to pay their suppliers and to fund the construction of the House. They were pressing Mr. Sayres for a second big down payment which was not required by the Purported Contract, and which Mr. Sayres declined to provide. Defendants assessed erroneous and impermissible upgrade fees on Mr. Sayres and they converted and diverted the upgrade fees that he paid Wheatland for other, impermissible purposes, because the Defendants lacked the funds necessary to pay their suppliers and to complete their existing contracts. This is evidenced by the fact that several vendors or suppliers to Wheatland called or otherwise contacted Mr. Sayres seeking payment for equipment or furnishings for which Mr. Sayres had paid purported upgrade fees to Wheatland at least several months earlier. This is also evidenced by the fact that there are many mechanic's liens on file in the land records department of the Loudoun County Circuit

20

Court liening not only the Subject Property but also several other properties owned by Wheatland.

74. $54,000 of the erroneously assessed upgrade or overage fees that Mr. Sayres paid to Wheatland through Mr. Evangelisto were not used by Defendants to install or pay for the equipment or furnishings for which they were designated, thus injuring Mr. Sayres in the amount of $54,000.

75. Wheatland and Evangelisto took Mr. Sayres' payments for purported upgrades and spent them on labor and materials for other houses they were building for other customers, general business and personal expenses, and a vacation for Mr. Evangelisto. They intended to use Mr. Sayres' other payments for these purposes at the times they were collected, and at the times they falsely told Mr. Sayres (orally and outside of any contract or document) that they planned to use his payments to pay the vendors and suppliers of the alleged upgrade equipment and furnishings.

76. Defendants' fraud regarding Mr. Sayres' payments for asserted upgrades, and their failure to use those funds to pay vendors of labor, equipment and materials for the House being built for Mr. Sayres, delayed the completion of the House by over six months from November 2008 through April 22, 2009, the present and beyond.

77. As the result of Defendants' willful and tortious fraud, Mr. Sayres paid his $250,000 deposit, he paid $104,000 in erroneously assessed upgrade fees, and he lost $200,000 in the diminished value of his previously owned house and land in Maryland due to the construction and completion delays caused by Defendants not using funds paid by Mr. Sayres to pay the suppliers of equipment, labor and materials for the House being built for Mr. Sayres. Defendant's fraud also caused Mr. Sayres to lose and be damaged in the amount of the

21

$50,000 that he paid an interior designer for design work on the House.

78. Defendants' fraud relating to Mr. Sayres was willful and intentional and was done with the intent to injure Mr. Sayres and with a reckless disregard for the rights of Mr. Sayres. Therefore, Mr. Sayres is entitled to recover $360,000 in punitive or exemplary damages from each Defendant, jointly and severally.

WHEREFORE, Mr. Sayres is entitled to recover as damages for fraud $604,000 in actual compensatory damages and $360,000 in punitive damages from each Defendant, jointly and severally, plus pre-judgment and post-judgment interest at the statutory rate, plus litigation costs, expenses and attorneys' fees.

## COUNT VI: DEFAMATION (LIBEL AND SLANDER)
### (vs. Wheatland and Mr. Evangelisto)

79. Plaintiff incorporates by reference the averments and allegations stated in Paragraphs 1 through 78 to this Complaint as though expressly set forth herein.

80. To cover up for their financial difficulties, their delays in ordering and installing equipment, options and furnishings, and their diversion and conversion of Mr. Sayres' funds, Wheatland and Evangelisto falsely defamed and disparaged Mr. Sayres, erroneously blaming him for Defendants' cancellation of orders for, and for Defendants' failures to timely pay for, specified materials and equipment, knowing that their defamatory and disparaging statements about Mr. Sayres were false.

81. AEGIS Technologies, the vendor of the audio and security technology system for the House, was contacting Wheatland as early as June and July 2008 due to Wheatland's failure to pay for ordered equipment. By e-mail dated July 22, 2008, Wheatland through Mr. Evangelisto falsely blamed Defendants' failure to pay the vendor on Mr. Sayres, incorrectly portraying him as having breached his Purported Contract by not making necessary payments

and as being distracted and inattentive to the business of completing and paying for the House. As an excuse for not paying AEGIS, Wheatland through Evangelisto falsely claimed to AEGIS in writing that: "This house is actually not progressing very fast at all as there have been some issues with the customer being on vacation in San Diego for the last three weeks and not returning for another week or so."

82.  In fact, Mr. Sayres already had paid for his share of the alleged cost of the technology system overage in April 2008, and he had been communicative and attentive while traveling with his laptop computer and answering e-mails.

83.  In an e-mail to Mr. Sayres a few days later, Wheatland contradicted what Defendants had stated to AEGIS and represented that construction of the House was moving forward rapidly.    That e-mail from Wheatland stated as follows:

> While you've been gone we have been busy working on the house and I wanted to take a minute to send you some pictures of our progress. In the past few weeks we have completed most of the wall and ceiling trim including the crown molding, shadow boxing, panel molding and some of the base molding in the carpet areas. We've also been working on all of the tile prep and applying a wire and concrete base to all of the bathroom showers. Inside we've been working on drywall touch-ups and are beginning to do all of the trim prep and get ready for paint. On the exterior we've completed the drywall in the porch ceiling which is now ready for paint, completed all of the beautiful cornice which decorates the top of the house where the stone meets the roof and poured the concrete for the porch stairs and the pad for the air conditioners and generator.

84.  On August 11, 2008, Wheatland sent an e-mail to Casey Stevenson of the tile vendor for the House. In this e-mail, Wheatland cancelled the order for Mr. Sayres' specified tiles for the House, falsely claiming that the tile order was being cancelled because Mr. Sayres had decided to move to California. Wheatland thus attempted to blame Mr. Sayres for cancellation of the tile order, falsely portraying him as an unreliable consumer and businessman who had breached his contract and had caused Wheatland to breach its contract

23

with the tile vendor. Upon information and belief, Mr. Evangelisto suggested and requested to the author of this e-mail that they should falsely blame the tile cancellation on Mr. Sayres.

85.　　In fact, Mr. Sayres had never indicated any intention to cancel the tile order, and it was done contrary to his preferences and over his objection. In fact, the August 2008 Change Order signed two days later expressly required, per the request of Mr. Sayres, that the previously ordered materials must be used and included in the House.

86.　　Wheatland and Evangelisto, directly or by reasonable implication, falsely disparaged Mr. Sayres' reliability as a consumer and a businessman, making him look fickle, unreliable and inattentive, and they stated or implied that Mr. Sayres had breached his Purported Contract and caused Wheatland to breach its contracts, when Defendants in fact knew that this was false and that they themselves were responsible for failing to pay, and for breaching their contracts with, vendors and suppliers of materials and equipment for the House.

87.　　The foregoing examples are the defamatory statements made by Defendants that were forwarded to Mr. Sayres by third parties. Mr. Sayres believes and alleges that Defendants made additional defamatory statements about him to other vendors as knowing, intentional, false and misleading ways for Defendants to deflect blame for their own financial difficulties and failures to pay for equipment and materials ordered.

88.　　Wheatland and Mr. Evangelisto made the false and disparaging written and oral remarks about Mr. Sayres knowingly, intentionally, and with actual malice, knowing that they were false and that they would damage Mr. Sayres' reputation as a consumer and a businessman.

89.　　Wheatland and Mr. Evangelisto made the false and disparaging written and oral

24

remarks about Mr. Sayres with reckless disregard for the harm and damages that they knew they would cause him, and with reckless disregard for their falsity.

WHEREFORE, Mr. Sayres seeks damages for libel, slander and defamation against Wheatland and Evangelisto, jointly and severally, in the amount of $100,000 in general damages and $360,000 in punitive or exemplary damages.

## COUNT VII: BREACH OF CONTRACT (vs. Wheatland)

90.  Plaintiff incorporates by reference the averments and allegations stated in Paragraphs 1 through 9 and 15 through 39 to this Complaint as though expressly set forth herein.

91.  In the alternative to Counts I through VI, pleading in the alternative that the Purported Contract in general was a valid and binding agreement, Wheatland breached the Purported Contract and the August 2008 Change Order by: (1) unilaterally reneging on and repudiating the Sayres Allowance Schedule and the materials allowance provision by erroneously insisting that the budgets and allowances set forth in the Sayres Allowance Schedule applied to and limited labor, design and installation costs included the base price of the House and not just materials costs; (2) not completing construction of the House on the Subject Property by November 2008, by April 15, 2009 or by the termination of the Purported Contract on April 22, 2009; (3) making unauthorized and improper materials, design and allowance changes, (4) not using payments made by Mr. Sayres to fund purported upgrades nor to pay for the alleged upgrades, (5) not purchasing nor installing the options or the upgrades which Mr. Sayres had erroneously been forced to fund, and, (6) not paying the vendors of the options and purported upgrades.

92.  All of these breaches have financially damaged Mr. Sayres and have

substantially and materially diminished the value and marketability of the House.

93. Mr. Sayres validly and effectively terminated, cancelled and rescinded the Purported Contract for breach and default by letter dated April 22, 2009, a copy of which is attached as Exhibit C.

94. In the event that Paragraph 13 of the Purported Contract is construed as authorizing a deduction from Mr. Sayres' deposit refund for alleged overages and upgrade fees which he forwarded and paid, then Paragraph 13 is an unreasonable and unconscionable liquidated damages and penalty provision as to Mr. Sayres, and Mr. Sayres is entitled to a full refund of his deposit plus all incidental and consequential damages.

95. In part because Wheatland had demanded that time was of the essence with respect to the April 15, 2009 closing and completion date, Wheatland's breaches are material, and Mr. Sayres was entitled to cancel and rescind the Purported Contract and all related change orders.

96. Mr. Sayres is entitled to recover from Wheatland his $250,000 deposit and $104,000 in erroneously imposed upgrade fees, to recover as damages the approximately $50,000 he paid an interior designer, with Wheatland's full knowledge, to assist with the design and completion of the House, and to recover the $200,000 he has suffered in the diminished value of his existing house and land in Maryland from Wheatland's failure to complete and deliver the House by November 2008, April 15, 2009 or April 22, 2009.

97. At the very least, Mr. Sayres is entitled to recover his $250,000 deposit on the House without any offset for alleged upgrade overages, since he has already paid the full $104,000 cost of the option and upgrade overages and since all of the purported upgrades should have been covered by the budget set forth in the Sayres Allowance Schedule in any

26

event.

WHEREFORE, Mr. Sayres respectfully requests and demands that his cancellation, rescission and termination of the Purported Contract be adjudged and decreed valid and effective, that he be awarded damages against Wheatland in the amount of $599,000, consisting of his $250,000 deposit, $104,000 in erroneously assessed upgrade and overage fees, $50,000 paid to his interior designer, and $200,000 in the diminished value of his previously owned house and land in Maryland, plus post-judgment interest, litigation costs, and pre-judgment interest dating back to April 22, 2009.

Respectfully Submitted this 28th day of August, 2009

JOHN F. SAYRES

Michael C. Whitticar (VSB #32968)
Thomas M. Dunlap (VSB #44016)
Dunlap, Grubb & Weaver, PLLC
199 Liberty Street, SW
Leesburg, VA 20175
(703) 777-7319 (phone)
(703) 777-3656 (facsimile)
tdunlap@dglegal.com
mwhitticar@dglegal.com
Counsel for Plaintiff John F. Sayres

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August, 2009, I caused a copy of the foregoing

First Amended Complaint to be sent by first-class mail, property addressed and postage

prepaid, to the following counsel of record for the Defendants:

James P. Campbell
Eric Zimmerman
Counsel for Defendants Wheatland Group and Joseph Evangelisto
Campbell, Miller and Zimmerman
19 East Market St.
Leesburg, VA 20176
Ph: 703.771.8344
Fax: 703-771-1485

Michael C. Whitticar

# Fixed Price Contract

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES AND SHOULD BE READ THOROUGHLY AND UNDERSTOOD PRIOR TO SIGNING. IF YOU SHOULD HAVE ANY QUESTIONS ABOUT YOUR RIGHTS OR RESPONSIBILITIES UNDER THIS AGREEMENT, YOU MAY WISH TO CONSULT AN ATTORNEY.

1. **Parties: The Wheatland Group, LLC.,** ("Seller") agrees to sell and convey to **John Sayres** ("Buyer") and Buyer agrees to buy from Seller the property described below.

2. **Property:** Lot **10-A1** of the **Melrose Farm** Subdivision located in **Loudoun County, Virginia** more specifically known as **14416 Loyalty Road, Leesburg, Virginia 20176.**

3. **Sales Price:**

   A. Non-refundable deposit to Seller        $ **250,000.00**

   B. Cash portion of sales price payable by Buyer at closing        $ **2,750,000.00**

   C. Sales Price (Sum of A, B)        $ **3,000,000.00**

It is acknowledged that Buyer has paid to Seller **$0.00** of the non-refundable deposit specified in paragraph 3A. On or before **4/13/2007**, Buyer shall pay to Seller **$250,000.00** representing the balance of Buyer's non-refundable deposit. Buyer's deposit shall be credited to Buyer at the closing of the sale described in this Contract. Except as expressly provided herein, the Seller shall retain the entire non-refundable deposit if this Contract is terminated for any reason other than Seller's default. It is further acknowledged that this non-refundable deposit is not earnest money.

4. **Title Policy and Survey:**

   A. *Title Policy:* Seller shall furnish to Buyer, at Buyer's expense, an owner policy of title insurance (the "Title Policy") issued by **Monarch Title, Leesburg, Virginia** (the "Title Company")

in the amount of the sales price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions:

   1. Restrictive covenants common to the platted subdivision in which the property is located.
   2. The standard printed exception for standby fees, taxes and assessments.
   3. Utility easements created by the dedication deed or plat of the subdivision in which the property is located.
   4. Reservations or exceptions otherwise permitted by this contract or as may appear in the commitment for title insurance.
   5. The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements.
   6. The standard printed exception as to marital rights.
   7. The standard printed exception as to waters, tidelands, beaches, streams, and related matters.

Within 10 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (the "Commitment") and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment other than the standard printed exceptions. Seller authorizes the Title Company to mail or hand deliver the Commitment and related documents to Buyer at Buyer's address shown below. If the Commitment is not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days. Buyer will have 7 days after the receipt of the Commitment to object in writing to matters disclosed in the Commitment.

NOTICE TO SELLER AND BUYER:

1. Seller advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

**5.    Property Condition:**

A.   *Construction Documents:*  Seller shall complete all improvements with due diligence in accordance with the plans initialed by the parties hereto, incorporated herein and identified as: **Colts Run Lot 42** together with the following allowances for materials to be selected at Buyer's discretion entitled: **Sayres Allowance Schedule** and any executed change orders hereafter agreed to by the parties in writing (all called "Construction Documents").

B.   *Change Orders:*  The Buyer may request changes in the work within a reasonable scope. Upon written directive by the Buyer, the Seller will make changes, additions or alterations. If the Buyer and the Seller agree on the cost of the modifications, they shall sign a written Change Order describing the changes to be made, any extra work to be done and any changes to the contract price or completion date. Change Orders shall be signed by all parties and become part of this contract. If more than one Buyer is involved, Buyers agree that either of them may sign the Change Order and that the signature of one is binding on the other.  Buyer agrees to make requests concerning any changes, additions or alterations in the work in writing directly to the Seller named in this Contract and not to the workers, including subcontractors and subcontractors' workers, on the job.  Any change orders requested by Buyer and approved by Seller shall be paid for by Buyer as follows: All amounts for additional improvements shall increase the sales price and shall be due and payable to Seller in cash prior to commencement of the change.  Both Buyer and Seller must agree to all change orders in writing.  Any change order which affects the sales price shall state the amount of the increase or decrease.  Should Buyer, at any time prior to or during the progress of the work request any modifications, alterations, deviations in, additions to, or omissions from, this contract or the Construction Documents (herein called "Changed Work"), Buyer shall request, in writing, that Seller undertake such Changed Work.

C.   *Buyer's Selections:*  If the Construction Documents permit selections by Buyer, Buyer's selections will conform to Seller's normal standards as set out in the Construction Documents or will not, in Seller's judgment, adversely affect the marketability of the property.  Buyer will make required selections within _____**30**_____ days after receipt of written notice from Seller.

D.   *Completion:*  The improvements shall be deemed to be substantially completed in accordance with the Construction Documents upon final inspection or issuance of a certificate of occupancy (or an equivalent document) from the applicable municipal authority.  In constructing the improvements, Seller shall employ its normal construction schedule and hereby advises Buyer that construction delays may result from inclement weather, inability to obtain building materials, problems with independent contractors, etc.  Upon substantial completion of the improvements, Buyer and Seller shall conduct a complete inspection of the property (the "Final Inspection").  During such Final Inspection, Buyer and Seller shall agree on any matters which, in the sole and absolute discretion of Seller, Seller elects to repair, modify or replace.  Such agreement shall be reduced to writing and signed by Buyer and Seller.  Any matters not expressly set forth in such written agreement shall be conclusively deemed acceptable to Buyer and Seller and Seller shall have no further obligations or liability with respect to such matters except as specifically provided in this Contract.  If Buyer does not participate in the Final Inspection, after receiving reasonable notice thereof from Seller, Buyer shall be conclusively deemed to have accepted the property as it exists on the date of the proposed Final Inspection.

E.   *Warranties:*

At closing, and upon Seller's receipt of the full sales price, Seller will warrant that the house will be substantially free from defects in workmanship and materials for one year. Other than those warranties provided by law, Seller only provides a warranty that the house meets the standards of "Residential Construction Performance Guidelines Homeowner Reference", copyright 2000, National Association of Homebuilders.

ALL MANUFACTURER WARRANTIES ON EQUIPMENT AND CONSUMER PRODUCTS INCORPORATED INTO THE PROPERTY SUCH AS AIR CONDITIONERS, HEATING UNITS, WATER HEATERS, REFRIGERATORS, RANGES, DISHWASHERS AND OTHER APPLIANCES OR EQUIPMENT SHALL BE ASSIGNED TO BUYER. SELLER MAKES NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT OR CONSUMER PRODUCTS AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS OF USE FOR A PARTICULAR PURPOSE, AND ANY OTHER WARRANTIES TO THE FULLEST EXTENT PERMITTED BY STATE OR FEDERAL LAW.

Seller agrees to assign to Buyer at closing all assignable manufacturer warranties.

**6.    Broker's Fees:** If applicable, a real estate brokerage commission of ____**0**____ % of the sales price will be earned by _____**Not Applicable**_____ (the "Broker") and become payable by Seller upon full payment of the sales price. Seller shall have no obligation to pay any commission in the event that this sale is not fully funded and closed, even if caused by Seller's default. Buyer represents and warrants that it has not contacted any other real estate broker, finder or other party in connection with this Contract and that no third party (including Buyer) shall be entitled to payment of any fee or compensation as a result of Buyer's acquiring the Property. Buyer hereby agrees to indemnify and hold Seller harmless from any loss, liability, damage, cost or expense (including reasonable attorney's fees) that arise from the breach of this representation and warranty.

**7.    Closing:** The closing of the sale will be within seven (7) days after the improvements are substantially completed (as defined in Paragraph 6D above).

**8.    Possession:** Seller shall deliver possession of the Property to Buyer on ____**TBD**____ Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a written temporary lease executed by the parties will establish a tenancy at sufferance relationship between the parties. *Consult your insurance agent prior to change of ownership or possession as insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.*

**9.    Land Use:**
Seller has informed Buyer and Buyer acknowledges, recognizes and agrees to the following:

A. Seller is neither responsible for nor has control of the zoning of the property adjacent to or in the vicinity of the Property;

B. Seller has no control over and is not responsible for any easements on, adjacent to, or in the vicinity of the Property and Buyer understands that individuals, corporations, and/or utilities may have specific rights granted by those easements, including but not limited to access and the use of the property described by the easements, which easement rights may exist whether or not such easements are being utilized at this time; and

C. Seller has no control over land which it does not own that is located adjacent to or in the vicinity of the Property and makes no representation as to what may or may not be built upon such property or how such property may be used in the future.

**10.   Settlement and Other Expenses:**

*Page 3 of 5*

A. The following expenses must be paid at or prior to closing:
   1. Loan appraisal fees will be paid by Buyer.
   2. All discount and buydown fees will be paid by Buyer.
   3. Seller's Expenses:
      (a) Releases of existing liens, including prepayment penalties and recording fees; preparation of deed; and other expenses stipulated to be paid by Seller under other provisions of this contract.

   4. Buyer's Expenses:
      (a) All Sales: Expenses incident to any loan, including application, origination, and commitment fees; interest on the notes from date of disbursement to one month prior to date of first monthly payments; recording fees; endorsements required by lender; copies of easements and restrictions; mortgagee title policy; loan-related inspection fees; credit reports; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, *ad valorem* taxes and special governmental assessment; tax statements or certificates; tax deletion; EPA endorsement; final inspection; other expenses stipulated to be paid by Buyer under other provisions of this contract.
      (b) Conventional Loan Sales: Expenses noted above and other loan-related expenses, including PMI premiums, photos, amortization schedules, one-half of escrow fee, preparation of loan documents, courier fee, repair inspections, underwriting fee, wire transfer, tax statements or certificates.

   B. In no event will Buyer pay charges and fees expressly prohibited by any applicable governmental loan program regulations.

   **11. Prorations:** Taxes for the current year, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. If taxes are not paid at or prior to closing, Buyer will be obligated to pay taxes for the current year and/or any rollback taxes associated with change in property status.

   **12. Casualty Loss:** If any part of the Property is damaged or destroyed by fire or other casualty loss after the effective date of the contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may either (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary, (b) accept the Property in its damaged condition and accept an assignment of insurance proceeds or (c) terminate this contract and Seller shall refund all deposit money and Buyer shall sign a full release voiding the contract with no responsibility one to the other.

   13. **Default:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may either (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and retain the entire deposit specified in paragraph 3A as liquidated damages, thereby releasing both parties from this contract. If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, the Closing Date will be extended as necessary. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may, as Buyer's sole and exclusive remedy, terminate this contract and receive from Seller the deposit less any changes to plans, specifications, decorative finish schedule or change orders, as agreed liquidated damages, thereby releasing both parties from the contract.

   **14. Special Provisions:**
   The parties understand that the price herein stated is predicated upon no undiggable rock or shale being encountered while excavating with a tracked front-end loader, grading or ditching, or any condition below the surface of the ground presenting unusual problems due to the presence of springs or other water streams, expenses for engineering reports, fill dirt requirements, poor soil condition, unknown or unstable

soil conditions, or any substantial movement of earth to or from the Premises. Contractor agrees to notify Owner of said conditions prior to backfill of foundation or trenches, if they occur. In such event, a mutually agreed upon Change Order shall be executed to compensate for the direct and indirect time and material costs or out-of-pocket expense incurred by Contractor due to removal, grading, foundation work and fill dirt as a result of said conditions, if any.

**15.  Agreement of Parties:** This contract, together with all attachments contains the entire agreement between Seller and Buyer with respect to the purchase of the Property, and replaces all prior agreements or understandings, if any. Seller is not bound by any statement, promise, condition or stipulation not specifically set forth in this contract. NO SALESPERSON OR REPRESENTATIVE OF SELLER HAS ANY AUTHORITY TO MAKE ORAL OR WRITTEN STATEMENTS, AGREEMENTS OR REPRESENTATIONS THAT MODIFY, ADD TO OR CHANGE THE TERMS AND CONDITIONS OF THIS CONTRACT.

**16.  Consult Your Attorney:** This contract is intended to be legally binding. READ IT CAREFULLY. If you do not understand the effect of this contract, consult your attorney BEFORE signing.

**17.  Notices:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile machine as follows:

| **To Buyer at:** | **To Seller at:** |
|---|---|
| John Seyres | The Wheatland Group |
| 301 Gray Dragon Place | 322 North Buckmarsh Street, Suite C |
| Edgewater, MD 21037 | Berryville, VA 22611 |

| | | | |
|---|---|---|---|
| Telephone: | 301-237-7777 | Telephone: | 540-955-9680 |
| Facsimile: | 301-805-4077 | Facsimile: | 540-955-9684 |

BUYER ACKNOWLEDGES AND REPRESENTS THAT BUYER HAS READ AND UNDERSTANDS THIS CONTRACT, AND ALL ATTACHMENTS AND THAT BUYER HAS NOT RECEIVED ANY ORAL REPRESENTATIONS AND IS NOT RELYING ON ANY VERBAL STATEMENT, PROMISE, CONDITION OR STIPULATION NOT SPECIFICALLY SET FORTH IN THIS CONTRACT OR THE ATTACHMENTS. BUYER UNDERSTANDS THAT SELLER IS RELYING ON THIS ACKNOWLEDGMENT AND REPRESENTATION AND THAT SELLER WOULD NOT AGREE TO SELL THE PROPERTY TO BUYER WITHOUT SUCH ACKNOWLEDGMENT AND REPRESENTATION.

EXECUTED this  31st   day of  March  ,  2007   (3/31/2007).

Buyer:  _[signature]_  John Sayres

Seller:  The Wheatland Group, LLC

By:  _[signature]_  Joseph A. Evangelisto

Title:  **Managing Member**

# Sayres Allowance Schedule

| Item | Allowance Estimate |
|------|--------------------|
| 1. Exterior Finishes | 215,000.00 |
| 2. Windows And Exterior Doors | 110,000.00 |
| 3. Roofing | 15,000.00 |
| 4. Garage Doors | 8,000.00 |
| 5. Driveway | 30,000.00 |
| 6. Plumbing Fixtures | 40,000.00 |
| 7. Light Fixtures | 40,000.00 |
| 8. Security/Structured | 43,500.00 |
| 9. Appliances | 30,000.00 |
| 10. Cabinetry | 115,000.00 |
| 11. Countertops | 50,000.00 |
| 12. Interior Moldings/Stair Parts/Doors | 80,500.00 |
| 13. Custom Built-ins/Shelving/Bookcases | 25,000.00 |
| 14. Paint | 75,000.00 |
| 15. Elevator | 25,000.00 |
| 16. Shower Doors | 8,000.00 |
| 17. Bath Hardware | 2,500.00 |
| 18. Door Hardware | 5,000.00 |
| 19. Hardwood Flooring | 75,000.00 |
| 20. Carpet | 15,000.00 |
| 21. Tile | 90,000.00 |
| **Total** | **$1,097,500.00** |

Lot 10A-1                                    Address: 14416 Loyalty Road

## ADDENDUM TO THE FIXED PRICE CONTRACT

Addendum made this 22nd day of April 2007 to the Fixed Price Contract by and between The Wheatland Group, LLC ("Seller") and John Sayres ("Buyer"), dated March 31st, 2007 (the "Agreement).

The undersigned Purchaser and Seller hereby agree to the following:

1. The Fixed Price Contract states that the deposit will be paid by April 13th. Due to circumstances beyond buyer's control that date will be amended to the 22nd of April. The Agreement is hereby amended to include the changes to the "Agreement".

2. All other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

This addendum, upon execution by both parties, is herewith made an integral part of the aforementioned Agreement.

DATE: 4/2/2007

SELLER:

DATE: 4/21/2007

PURCHASER:

# DUNLAP | GRUBB | WEAVER

ATTORNEYS & CONSULTANTS

WWW.DGLEGAL.COM
199 LIBERTY STREET, SW
LEESBURG, VA 20175
PHONE: (703) 777-7319
FAX: (703) 777-3656
ZKHAN@DGLEGAL.COM

April 22, 2009

**BY FIRST-CLASS MAIL,**
**BY FACSIMILE to [(540) 338-1695], and**
**BY E-MAIL to joe@thewheatlandgroup.com**

Joseph Evangelisto, Manager
The Wheatland Group, LLC
d/b/a Wheatland Custom Homes
500 E. Main Street
Purcellville VA 20132

Re:     **Termination of Contract on 14416 Loyalty Road Property**

Dear Sir:

This firm represents John Sayres with respect to his contract for the purchase of the property known as 14416 Loyalty Road in Leesburg, Virginia. We write on behalf of Mr. Sayres to terminate that Contract pursuant to Paragraph 13 thereof for breach and default by the seller, Wheatland Group, LLC ("Wheatland"). Mr. Sayres seeks a full refund of his deposit and all funds paid pursuant to Paragraph 13 of the Contract, and then Wheatland will be free to complete the house and market the property for sale to others.

Mr. Sayres is terminating the Contract based on the following defaults by Wheatland:

(1)     Wheatland breached and repudiated the Contract by unilaterally revising and inaccurately recharacterizing Paragraph 5(A) and the "Sayres Allowance Schedule" as limiting all option and allowance costs, including labor and installation, when your contract clearly stated that these limits are only applicable to "materials" costs.     By failing to abide by the original Contract language, Wheatland unilaterally raised the price of the house and diminished the options available to Mr. Sayres.

(2)     Wheatland breached and defaulted on the Contract by failing to complete construction of the house by April 15, 2009 even though Wheatland's recent letter stated that "time was of the essence", that the house would be ready for walk-through by April

8, 2009, and that closing would take place by April 15, 2009. In fact, as of April 19, 2009, there was no elevator in the house, all bedrooms except the master bedroom lacked flooring, the generator was missing from the side of the house, the house was still missing security and entertainment speakers and related panels, many of the appliances still had not been installed, and the lighting fixtures still had not been installed and/or were missing.

(3)     Wheatland breached and defaulted on the Contract by repeatedly charging Mr. Sayres extra for upgrades, stating that you needed advances to pay the vendors off and to cover the costs of the upgrades, and then not paying the vendors and not paying for or installing the upgrades on time, correctly or, in many instances, at all. For example, you never paid AEGIS Technologies for the technology package ($24,904.33) and then you falsely blamed Mr. Sayres for your delay and failure to perform. Innovative Lifts who was contracted to provide and install the elevator has contacted Mr. Sayres because of your failure to pay and meet your obligations. The elevator vendor has not been paid and the elevator has not been installed even though you were paid $4,650.00 for the elevator upgrade by Mr. Sayres on March 8, 2008.

(4)     Making incorrect and impermissible design changes and deviations in violation of Mr. Sayres's original selections and in violation of the change order. For example, in addition to many other errors and unauthorized materials changes, you cancelled or did not install the previously ordered flooring tiles and wood, presumably to select cheaper and incorrect flooring over almost 8,000 square feet of floor space, despite the fact that the correct tiles and wood had been ordered by the time the change order was signed. You cancelled or changed the order for appliances, plumbing fixtures and lighting fixtures with the incorrect ones despite the fact that the correct appliances plumbing and lighting had been ordered when the change orders were signed and despite the fact that Mr. Sayres paid you $23,590.03 by check for these items in January and February 2008. These are not all of the changes that have been made in violation of both the original selections and the change order.

All the breaches and defaults set forth above were within Wheatland's reasonable control and are its own fault. Therefore, pursuant to Paragraph 13 of the Contract, terminating the Contract and getting his money back is the only option available to Mr. Sayres, and he hereby elects to exercise that option.

Please ensure that no later than May 6, 2009 I receive a certified check payable to John Sayres refunding Mr. Sayres's deposit in full ($250,000.00) and covering all the costs of the extra and/or upgrade allowance charges paid by Mr. Sayres ($103,624.66).

Sincerely,

Michael C. Whitticar

Michael C. Whitticar

# Change Order

Project: __14416 Loyalty Road__    Change order #: __13__

__Leesburg, VA 20176__    Contract date: __3/21/2007__

Buyer: __John Sayres__    Project #: __MF10A__

---

### Seller and Buyer agree to make these changes in the contract:

On Wednesday August 13th, 2008 John Sayres (Purchaser) informed The Wheatland Group LLC (Seller) that their plans had changed and they would likely be relocating. As a result the Purchaser would like the Seller to complete the contract to construct the home at 14416 Loyalty Rd, Leesburg VA 20176 within the allowance budget remaining to date and in a design that will be more appealing for re-sale to any potential buyers. With this understanding both the Purchaser and Seller would like to execute the following changes to the contract.

1. Purchaser agrees to allow the seller to make the remaining selections and bring the home to completion
2. Purchaser agrees that all materials already ordered to date (8/13/08) will remain included in the completion of the construction and that all improvements performed to date (8/13/08) should remain
3. Purchaser agrees that seller should complete the contract to construct the home at 14416 Loyalty Rd, Leesburg VA 20176 within the allowance budget remaining.
4. Purchaser agrees that seller may reallocate the remaining funds in the allowance schedule at the seller's sole discretion in order to complete the construction within the remaining allowance budget

| | | |
|---|---|---|
| Original contract sum: | $ | $3,000,000.00 |
| Net change by previous change orders: | $ | $103,624.66 |
| Contract sum prior to this change order: | $ | $3,103,624.66 |
| Increase or decrease by this change order: | $ | $ 0 |
| Net contract sum: | $ | $3,103,624.66 |

Items not yet priced include:

N/A

Effective date and signatures:

We, the undersigned, have read and understand and agree to each of the provisions of this change order and hereby acknowledge receipt of a copy of this change order.

Buyer    8-21 08      Seller    8-21-08
John Sayres    Date      Joseph A. Evangelisto – Sole Member    Date
     The Wheatland Group, LLC.

© BuilderBooks 2006